**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-2811-GPG-NRN

URBAN INTERESTS LLC, individually and
on behalf of all others similarly situated,

    Plaintiffs,

v.

FLUID MARKET INC.,
FLUID FLEET SERVICES LLC,
HHK VEHICLES, INC.,
JAMES EBERHARD,
JENIFER SNYDER,
THOMAS SCOTT AVILA, and
PALADIN MANAGEMENT GROUP, LLC

    Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT JENIFER SNYDER'S
MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Plaintiff Urban Interests LLC submits the following response in opposition to Defendant Jenifer Snyder's Motion to Dismiss. Dkt. 85.

## INTRODUCTION

Ms. Snyder's Motion asks the reader to enter an alternative universe. In that universe, Snyder is just one more Fluid "employee," *id*. at 11, not its co-founder and general counsel. In that universe, Snyder's decision to spend money held in trust for other people is not theft, but is instead something that just happened on its own when the "process began to break down," and the fact that Fluid was "prevented … from acting in accordance with its well-intentioned promises" can be chalked up to nothing more than "an unforeseeable change in circumstances." *Id*. at 3, 8-9. And in that universe, the only party at fault here is the corporate (and now, conveniently, bankrupt) entity Fluid, not Snyder—despite the fact that she just so happens to be the very same person who hatched and spearheaded the very scheme by which Fluid stole tens of millions of dollars from hundreds of people. *Id*. at 3-4.

Although it is understandable why Snyder might prefer her universe, this case was filed in Colorado. And in Colorado, the law is crystal clear that company officers who directly participate in a company's tort cannot hide behind the entity when that tort is uncovered. This principle is not debatable: For nearly 100 years, Colorado courts have held that corporate officers can and will be held "personally liable to third persons for a tort [if] the officer of a corporation . . . participated in the tort." *Hoang v. Arbess*, 80 P.3d 863, 868 (Colo. App. 2003). And although Snyder tries to sidestep this black-letter rule by insisting she no longer "personally retained" the stolen funds, Dkt. 85 at 14, that misses

1

the point entirely: The Colorado Supreme Court has had little trouble assessing personal liability to corporate officers who steal money owned by third parties and then use it for company expenses—even if those officers no longer "personally retained" the funds. *Standley v. Am. Auto. Ins. Co.*, 314 P.2d 696, 697-98 (Colo. 1957). Put simply, Plaintiff's claims against Snyder are more than sufficiently pleaded at this stage.

Fraud: In January 2024, Ms. Snyder personally revised and approved Fluid's decommissioning policy, in which it promised to sell vehicles on owners' behalf, only deduct certain fees, and remit funds within 30 days. Dkt. 76 ¶¶ 23-24. She did so with full knowledge that her promises to repay FVIP owners were false—which we know because Ms. Snyder herself already had directed Fluid to raid FVIP vehicle sales proceeds and use them as though they were company "proceeds" that could freely be spent for Fluid operations. *Id*. ¶¶ 32, 35, 103-04; Ex. 1 (1/9/24 decommissioning policy); Ex. 2 at 46:6-47:6, 49:5-50:12 (B. DuPree transcript).[1] And Ms. Snyder then fraudulently concealed from Plaintiff and the putative class not only the role and existence of HHK Vehicles ("HHK")—the off-books side company she owns and controls with James Eberhard, her brother, co-founder, co-defendant, and Fluid's former CEO—but also the fact that HHK would possess and spend vehicle owners' money rather than return it to FVIP owners. Ex. 1; Dkt. 76 ¶¶ 27, 31, 37, 61. Ms. Snyder also concealed her improper "shareholder loans" for her personal use, which she never repaid. Dkt. 76 ¶¶ 40-41.

---

[1] Because Plaintiff specifically referred to Ms. Snyder's revisions to the decommissioning policy and Brennen DuPree's testimony in its Complaint and they are central to Plaintiff's claims, Dkt. 76 ¶¶ 23, 34, the Court may consider them in evaluating the motions to dismiss. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Further, Snyder herself cites these documents in support of her motion. Dkt. 85 at 8.

2

These facts are thoroughly pleaded in the operative complaint; they are all highly material to this case; and taken as pleaded, they are more than sufficient to state a fraud claim—after all, Plaintiff agreed to allow Fluid to sell its vehicles "in direct reliance" on the very same decommissioning policy that has now been revealed to be false. Dkt. 76 ¶ 43.

<u>Civil theft</u>: At Ms. Snyder's specific direction, Fluid took FVIP owners' money out of the Disposition Accounts—where it was supposed to be segregated and held in trust for Plaintiff and other owners—and spent it on company operations. *Id*. ¶¶ 52-60. At Ms. Snyder's direction, Fluid continued to accept vehicles for sale even after Fluid had halted payments to FVIP owners, long after she began raiding the Disposition Accounts, and knowing full well that Fluid would not repay FVIP owners. *Id*. ¶ 61. And at Ms. Snyder's direction, Fluid transferred Disposition Account funds to HHK. *Id*. ¶ 62.

Once again, these allegations are thoroughly pleaded; they are highly material; and taken as pleaded they are more than sufficient to state a civil theft claim: Snyder and Fluid obtained or retained funds held in trust for FVIP owners without authorization. Again, the core of Plaintiff's civil theft claim against Ms. Snyder is that although she knew full well that she was taking FVIP owners' money, neither she nor anyone else at Fluid deigned to inform those owners of that fact, or that the same funds were going to be diverted through HHK. *Id.* ¶¶ 31, 111-12, 123. That this taking of Plaintiff's funds was not authorized is readily apparent: After all, the decommissioning policy makes expressly clear that Fluid was not authorized to hold FVIP owner funds for more than 30 days, or spend them elsewhere, and yet Ms. Snyder and Fluid did just that through a series of

3

intentionally deceptive promises of prompt payment. Spending the funds elsewhere shows a specific intent to permanently deprive. *Id*. ¶ 123.

<u>Conversion</u>: Ms. Snyder does not dispute that Plaintiff has pleaded a viable conversion claim against Fluid. Colorado law provides that corporate officers who collect funds owed to third parties, commingle them with company funds, and then use those funds for other purposes are personally liable for conversion—even if they "received no personal benefit from the misapplication of the funds*.*" *Standley*, 314 P.2d at 697-98. The Complaint states such a conversion claim against Ms. Snyder.

At bottom, the operative Complaint more than sufficiently alleges Ms. Snyder's personal participation in and direction of a widespread fraud, civil theft, and conversion scheme. The Court should deny the motion.

## RELEVANT FACTS

Ms. Snyder is Fluid's co-founder, and was its general counsel until July 2024. Dkt. 76 ¶¶ 1, 8. Fluid was an online vehicle rental platform. *Id*. ¶ 16. It offered a Fluid Vehicle Investor Platform ("FVIP") that enabled third parties to buy vehicles, and rent them out via Fluid's platform. *Id*. ¶ 17. Fluid managed all of the rental business on behalf of FVIP vehicle owners: it provided insurance, maintenance, and repair, collected payments, and handled all other day-to-day tasks. *Id*. ¶ 18.

Plaintiff Urban Interests became an FVIP owner in 2020, and over time bought 47 vehicles. *Id*. ¶¶ 19-20. Urban Interests entrusted Fluid both with its vehicles and the original paper copies of the vehicle titles. *Id*. ¶ 21. When FVIP owners like Urban Interests wanted to "decommission" their vehicles—remove them from the Fluid fleet—

Fluid solicited those FVIP owners to allow Fluid to "sell [the] vehicle on [owners'] behalf" through a third-party auction service. *Id*. ¶¶ 1, 22-23. Ms. Snyder personally revised and approved Fluid's decommissioning policy, in which she and Fluid promised to remit proceeds to owners "within 30 days of the sale." *Id*. ¶ 24. For some time prior to Ms. Snyder's January 2024 revisions, Fluid paid sales and insurance proceeds to Urban Interests when Urban Interests requested decommissioning and third-party sales. *Id*. ¶ 25. But "[u]nbeknownst to the FVIP vehicle owners," Snyder was diverting FVIP owners' proceeds through HHK as early as 2022. *Id*. ¶¶ 26-28, 30. Critically, HHK never had "authorization from FVIPs to possess proceeds from their vehicle sales." *Id*. ¶ 31.

The reason for secrecy is now obvious: Snyder intentionally delayed payment from HHK, and used HHK as a personal bank account. *Id*. ¶ 32. Snyder falsely told FVIP owners the third-party auction service—not HHK—had delayed payment. *Id*. Meanwhile, Snyder used FVIP owners' money to fund Fluid's failing operations. *Id*. ¶ 33. Snyder personally underpaid the funds belonging to FVIP owners, and directed "whether FVIP owners were paid at all." *Id*. ¶¶ 34-35. And at Snyder's direction, "much of Urban Interests' sales proceeds were held at HHK Vehicles, not Fluid Truck, without the knowledge or authorization of Urban Interests." *Id*. ¶ 47.

Even when funds were transferred to accounts specifically designated for FVIPs' sales proceeds, "Snyder personally directed Fluid employees to transfer funds from these two Disposition Accounts into Fluid's operating accounts." *Id*. ¶ 53. With her administrator and signature privileges over Fluid's bank accounts, between August 2023 and July 2024, Snyder directed the transfer of more than $7.7 million from the designated

5

"Disposition Accounts" (holding FVIP-owned funds) to Fluid's operating accounts. *Id*. ¶¶ 54-59. She also directed the transfer of more than $4.1 million from the Disposition Accounts to HHK. *Id*. ¶ 62. Then, in the spring of 2024, she instructed Fluid to keep accepting FVIP decommissioning requests—even after Fluid had halted payments to FVIP owners to use those funds for operating expenses and while knowing Fluid and HHK would never repay proceeds from vehicle sales. *Id*. ¶ 61.

At bottom, Fluid admits it owes $178,216 to Plaintiff for net sales and claims proceeds in connection with the decommissioning of Plaintiff's Vehicles. *Id*. ¶ 49. And on a much wider scale, Fluid admits it wrongfully retained more than $11 million in proceeds owned by hundreds of vehicle owners comprising the putative class in this case. *Id*. ¶¶ 50, 93. This is more than enough to support Plaintiff's claims against Ms. Snyder.

## ARGUMENT

### A.  Standard of Review

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient facts, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). A claim is not plausible "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "'nudge [the] claims across the line from conceivable to plausible.'"

*Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted). In assessing a claim's plausibility, a complaint's legal conclusions are not entitled to the assumption of truth. *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal one, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotations and citation omitted).

### B. Individual Corporate Officers Are Directly Liable for Company Torts Which They Direct, or in Which They Actively Participate or Cooperate

Snyder's motion buries the obvious anchor for her personal liability: the black-letter principle that corporate officers may be directly and personally liable for their company's torts "'if they approved of, sanctioned, directed, actively participated in, or cooperated in such conduct.'" *Hildebrand v. New Vista Homes II, LLC*, 252 P.3d 1159, 1166 (Colo. App. 2010) (quoting *Colo. Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 28 (Colo. App. 2010)); *see also List Interactive, Ltd. v. Knights of Columbus*, 303 F. Supp. 3d 1065, 1078 (D. Colo. 2018) ("'*At a minimum, personal liability attaches to a defendant who was directly involved in the conduct through conception or authorization*.'") (citation omitted; emphasis in original). This principle, Colorado courts have explained, prevents "'an agent of a corporation'" from "'inflict[ing] wrong and injuries upon others'" "'in [the course] of carrying on its business'" and "'shield[ing] himself from liability,'" because to allow such an officer to avoid liability in that situation "'would often both sanction and encourage the perpetration of flagrant and wanton injuries by agents of insolvent and irresponsible corporations.'" *Hoang*, 80 P.3d at 867 (citation omitted).

7

Understood against this backdrop, the Complaint easily states claims against Snyder. Belatedly acknowledging the doctrine, Dkt. 85 at 14-15, Snyder tries to wave away the thorough allegations against her as "threadbare" and "conclusory." *Id*. Not so. Rather than merely assuming Snyder participated in this scheme by virtue of her title, *id*. at 14, the Complaint specifically alleges her central role in initiating, directing, and executing it. Without authorization from FVIP owners, she personally diverted sales proceeds through HHK. Dkt. 76 ¶¶ 27-31. Snyder personally "delay[ed] HHK Vehicles' payment of sales proceeds to Fluid Truck, and then from Fluid Truck to FVIP owners, and falsely t[old] FVIP owners that the third-party auction service had delayed payment." *Id*. ¶ 32, 36-37. Snyder personally directed Fluid's raiding of the Disposition Accounts—which were specifically designated for FVIPs' funds—for company operations. *Id*. ¶¶ 52-53. From August 2023 to July 2024, she personally directed the transfer of more than $7.7 million from the Disposition Accounts to Fluid's operating accounts, and $4.1 million from the Disposition Accounts to HHK's bank accounts. *Id*. ¶¶ 55-59, 62. Snyder also issued herself "loans" from HHK and never repaid them. *Id*. ¶¶ 40-41. And even after Fluid halted all FVIP repayments (because Fluid was using the money itself), Snyder told Fluid to keep selling FVIP vehicles on their behalf—so as not to deprive Fluid of more funds to steal for operations. *Id*. ¶ 61.

The Complaint specifically alleges Ms. Snyder's key role in this theft scheme at Fluid and HHK. Those allegations are enough to plead her participation, and thus to state claims against her personally. *McCormick v. HRM Res., LLC*, 2025 WL 90148, at *4 (D. Colo. Jan. 14. 2025) (denying motion to dismiss where complaint alleged individuals

8

"personally oversaw operations at their respective companies"); *Pso-Rite.com LLC v. Thrival LLC*, 2024 WL 115124, at *8 (D. Colo. Jan. 10, 2024) (denying motion to dismiss where complaint "pled sufficient facts to show that the individual defendants participated in the conception and authorization of [the company's] allegedly infringing conduct").

### C. The Complaint Thoroughly Alleges Snyder's Approval and Sanction of, and Cooperation In, Fluid's Civil Theft

More specifically, the Complaint states a claim for civil theft against Snyder. "A person commits theft under section 18–4–401(1) when he or she 'knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception,' and acts intentionally or knowingly in ways that deprive the other person of the property permanently." *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 608 (Colo. 2016) (quoting C.R.S. § 18–4–401(1)(a)-(d)). A civil theft claim requires that the defendant have the "'specific intent to permanently deprive the owner of the benefit of the property.'" *Id*. (quoting *Itin v. Ungar*, 17 P.3d 129, 134 (Colo. 2000)); *see also Miles v. BKP Inc.*, 2022 WL 4245956, at *8 (D. Colo. Sept. 15, 2022) (the court can infer specific intent from plaintiff's allegations).

Snyder initially argues that the civil theft claim, as pleaded, is legally defective because it "does not allege that Snyder has personally retained the funds." Dkt. 85 at 14. This argument fails on multiple levels. First, the civil theft statute itself permits a claim against the "taker" or "any person in . . . possession" of stolen property. C.R.S. § 18–4–405. What that means, of course, is if a defendant may be liable as *either* a "taker" *or* "possessor" of stolen property, then that defendant is not required still to retain or possess the money in perpetuity. That the defendant retain possession is an additional element

9

not found in the statute, and which would impermissibly read the word "taker" out of the statute.  *In re Mallo*, 774 F.3d 1313, 1317 (10th Cir. 2014) ("We construe statutes 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'") (citation omitted).  Second, such a purported requirement is belied by decades of Colorado caselaw, including *In re Estate of Chavez*, where the defendant was held liable even after returning the money to its owner.  520 P.3d 194, 204 (Colo. App. 2022) ("[R]eturning funds taken from Marie's account is not a defense to civil theft."); *see also Becker & Tenenbaum v. Eagle Restaurant Co.*, 946 P.2d 600, 602 (Colo. App. 1997) (affirming civil theft judgment where "[t]he funds represented by the check were disbursed to pay Eagle's other creditors during the period the check was wrongfully withheld, and plaintiffs were, thus, deprived of the use or benefit of the value of the check by the withholding"); *People v. Pedrie*, 727 P.2d 859, 863 (Colo. 1986) ("The fact that stolen property was eventually returned is not a defense to a theft charge.").

Arguing otherwise, Snyder points to *Cedar Lane Invs. v. Am. Roofing Supply of Colorado Springs, Inc.*, 919 P.2d 879, 882 (Colo. App. 1996).  Dkt. 85 at 14.  But *Cedar Lane* has no application here.  Unlike Snyder, HHK, and Fluid, the defendant there was neither the taker nor the possessor of the stolen property—nor even a participant in the civil theft—but rather an innocent recipient who had already spent the money.  919 P.2d at 882.  And *Cedar Lane* concerned only the "possessor" prong of the civil theft statute, without any discussion at all about the "taker" prong.  *Id.*  Here, by contrast, Snyder conceived of and directly participated in the taking.

Third, and most importantly, Colorado law is clear that a corporate officer who participates in a company's tort is personally liable. *See supra* at 7-9. Because civil theft is a tort, Snyder may be held personally liable for her participation in it.

Snyder then claims Plaintiff and other FVIP owners somehow authorized HHK to take the sales proceeds, keep them longer than 30 days, and raid segregated Disposition Accounts for other purposes. Dkt. 85 at 13. This argument is frivolous: Plaintiff repeatedly alleged Fluid and HHK obtained, retained, and used sales and insurance proceeds without authorization. Dkt. 76 ¶¶ 31, 47, 85-86, 111-12, 123.

Next, Snyder tries to invent claim elements and details not required by *Twombly/Iqbal*. Dkt. 85 at 13-14. Plaintiff need not "identify who Snyder allegedly directed." *Id*. at 13. Snyder baldly claims that Plaintiff has not alleged her actions in cooperation with the civil theft, or allege any "operational role or responsibility" that could support her involvement. Dkt. 85 at 13-14. Again, this willfully ignores the Complaint, which alleges Snyder conceived of Fluid's plan to sell the vehicles "and simply pocket the money," Dkt. 76 ¶ 1, to divert proceeds to HHK without authorization, *id*. ¶¶ 28-32, to "personally direct[] the timing of sales proceeds payments to FVIP owners" and use that money to fund Fluid's operations, *id*. ¶ 35, to delay HHK's payment or fail to make the transfer to Fluid at all, *id*. ¶¶ 36-37, to use FVIP funds at HHK for her personal spending, *id*. ¶¶ 40-41, to raid the segregated FVIP funds to the tune of more than $11 million, *id*. ¶¶ 53, 59, and to halt all FVIP payments "to preserve those funds for operating expenses," while continuing to accept FVIP vehicles for sale (and theft). *Id*. ¶ 61. These specific allegations show not mere "cooperation," but rather active direction and management of

11

the entire process—including the concerted decision not to pay proceeds to Plaintiff and other class members.

Finally, Snyder falsely claims the Complaint is "bereft" of an allegation that any party "acted with an intent to permanently deprive." Dkt. 85 at 15. But that is located at Paragraph 123, Dkt. 76, and can be inferred from Snyder spending other people's money, and from lying about Fluid's and HHK's use of the supposedly delayed payments, while continuing to accept decommissioning requests. See *Miles*, 2022 WL 4245956, at *8 (inferring sufficient specific intent to survive motion to dismiss from employee failing to clock out for lunch at least 70 times and her knowledge of employer's policies).

### D. The Complaint Sufficiently Alleges Snyder's Conception and Direction of, and Active Participation In, Fluid's Conversion

The Complaint also states a claim for conversion against Snyder because Colorado's doctrine of personal liability for participation in corporate torts applies equally to a conversion claim. *Standley*, 314 P.2d at 697-98.

Just as with her participation in Fluid's civil theft, *see supra* at 8-10, Snyder likewise condoned and continued Fluid's conversion scheme, and that means she can be held personally liable for it. Again, Colorado law is clear that corporate officers who collect funds owed to third parties, commingle them with company funds, and use those funds to pay employee wages were personally liable for conversion—even if "they received no personal benefit from the misapplication of the funds*." Standley*, 314 P.2d at 697-98. These allegations are enough to deny Snyder's motion as to conversion.

In the teeth of all this, Snyder tries to hide behind Fluid and HHK, arguing that the conversion claim fails because Plaintiff did not allege Snyder's personal dominion over

12

the property. Dkt. 85 at 14 ("Plaintiff … believes Fluid Truck and HHK Vehicles—not Snyder—knowingly exercised control over its funds without authorization"). This blinks reality. Snyder was not a low-level employee, but rather the general counsel who controlled both companies; she stole FVIP funds from HHK; she made all decisions about FVIP vehicle sales repayment; and she and Mr. Eberhard control HHK, through which they diverted proceeds. Her participation is enough, and even so Plaintiff alleges her personal dominion over stolen funds.

### E. The Complaint Sufficiently Alleges Snyder's Conception and Direction of, and Active Participation in, Fluid's Fraud

As to fraud, co-founder and general counsel Snyder points the finger at Fluid: "[E]ach of Plaintiff's allegations regarding the alleged fraudulent representations are solely premised on the conduct of Fluid Truck." Dkt. 85 at 7. What this misses, of course, is her controlling role in this scheme.

At the first step, the Complaint states a plausible claim of fraud by Fluid. Critically, Snyder does not dispute that Plaintiff states a plausible fraud claim against Fluid. *Id. at 7*. But Snyder's only argument against the fraud claim is her attempt to ignore (again) what the Complaint alleges—that she personally revised and approved the decommissioning policy and fraudulently concealed the diversion of funds held in trust through HHK—and hide behind Fluid, *id*. at 7-8.

Snyder cannot escape the undisputed allegation—supported by Mr. DuPree's deposition—that she personally revised and approved the Fluid decommissioning policy in January 2024, when Fluid and Snyder were already raiding the segregated Disposition Accounts. Dkt. 76 ¶¶ 23-24, 103-04; Ex. 1 (1/9/24 decommissioning policy); Ex. 2 at 46:6-

13

47:6, 49:5-50:12 (B. DuPree transcript).  Snyder claims to find some "confusion" in the fact that she personally participated in Fluid's fraudulent misrepresentations.  Dkt. 85 at 7-8.  Of course, both things can be, and are, true:  Fluid issued the policy, and Snyder personally revised it, and directed its publication.  This isn't "disingenuous," *id*. at 8, but rather recognizes that actual people like Snyder do bad things, even at companies.

Snyder next says the Complaint does not allege Fluid and Snyder knew the policy's misstatements were false when made.  Dkt. 85 at 8-9.  But that is a matter for discovery, and this Court can readily infer this from Snyder's revision and issuance of the policy—as evidenced by the Complaint's allegations and the contents of its incorporated documents.  Exs. 1 & 2.  By then, Snyder was diverting sales proceeds through HHK, Dkt. 76 ¶¶ 27-28, 31, 61, intentionally delaying repayment, *id*. ¶ 32, issuing sham "loans" of FVIP funds to herself, *id*. ¶¶ 40-41, and raiding the Disposition Accounts, *id*. ¶¶ 56-58.  And Plaintiff relied directly on this policy when deciding to sell its vehicles.  *Id*. ¶¶ 43, 106.

### F.   The Amended Complaint Pleads Fraud with Particularity

Snyder hedges her bets on the fraud claim by arguing it does not comply with Rule 9(b) because it supposedly lacks enough details about the precise nature of Snyder's revisions to the decommissioning policy, such as which "commas" she added, or which paragraphs she reviewed.  Dkt. No. 85 at 9-11.  This picayune level of detail may be fodder for cross examination, but it is not a serious argument for a motion to dismiss, because it is not required by Rule 9(b), *Twombly/Iqbal*, or Colorado's doctrine of personal liability for participation in corporate torts.

Snyder does not argue the Complaint's allegations regarding Fluid's fraudulent statements are insufficiently particular as to Fluid. *Id*. Nor could she. The Complaint identifies Fluid's decommissioning policy, which was published on Fluid's website, and which promised proceeds would be paid within 30 days after the vehicle sale. Dkt. 76 ¶¶ 23-24. Plaintiff alleges that when it "decided to decommission and sell its remaining vehicles . . . through the same process" in late 2023 and early 2024, it did so "in direct reliance on Fluid Truck's decommissioning policy." *Id*. ¶¶ 42-43. By those paragraphs, the Court can infer Plaintiff relied on Fluid's written policy close in time to its decision to decommission those specific vehicles in late 2023 and early 2024. The Complaint also includes those facts by reference to the policy itself and Mr. DuPree's deposition. Exs. 1 & 2. Snyder might quibble with whether Plaintiff can prove those facts at trial, but they suffice for purposes of Rule 9(b). *U.S. ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) ("Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.") (internal quotes and citation omitted). Because the Complaint also alleges Snyder's personal participation in these fraudulent acts, the allegations as to Fluid suffice for Snyder as well. *Kcooper Brands, Inc. v. Ezzigroup, Inc.*, 2022 WL 1500775, at *6 (D. Colo. May 12, 2022) (fraud allegations against company satisfied Rule 9(b), and thus its CEO individually because "those allegations (if true) are sufficient to indicate [CEO's] direct involvement in inducing Plaintiff's reliance").

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be denied.

Dated this 23rd day of May, 2025

Respectfully submitted,

*/s/ David C. Holman*
David C. Holman
John K. Crisham
Christopher T. Carry
CRISHAM & HOLMAN LLC
2549 West Main Street, Suite 202
Littleton, Colorado 80120
Telephone: (720) 739-2176
E-mail: Dave@crishamholman.com
E-mail: John@crishamholman.com
E-mail: Chris.carry@crishamholman.com

*Attorneys for Plaintiff Urban Interests LLC*

16

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 23rd day of May, 2025, a true and correct copy of the foregoing document was filed via this Court's CM/ECF filing system and served on all counsel of record.

*/s/ Amanda Turney*
