**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-2811-GPG-NRN

URBAN INTERESTS LLC, individually and
on behalf of all others similarly situated,

    Plaintiffs,

v.

FLUID MARKET INC.,
FLUID FLEET SERVICES LLC,
HHK VEHICLES, INC.,
JAMES EBERHARD,
JENIFER SNYDER,
THOMAS SCOTT AVILA, and
PALADIN MANAGEMENT GROUP, LLC,

    Defendants.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS PALADIN MANAGEMENT GROUP, LLC AND THOMAS SCOTT AVILA'S MOTION TO DISMISS**

---

Plaintiff Urban Interests LLC ("Plaintiff") submits the following response in opposition to Defendant Paladin Management Group, LLC ("Paladin") and Thomas Scott Avila's (collectively "Defendants") Motion to Dismiss. Dkt. No. 89.

Defendants' motion should be denied. Not only do Defendants ignore the governing legal standard for a motion to dismiss by disregarding Plaintiff's well-pleaded factual allegations, but they then inject their own contradictory facts to support a legally flawed theory, and they then repeatedly mischaracterize Colorado law on civil theft and seek to add non-existent legal elements. Accepting the Complaint's factual allegations as true and interpreted in the light most favorable to Plaintiff, Plaintiff easily states plausible claims for relief against Defendants.

## INTRODUCTION

Fluid was an on-demand vehicle rental platform that offers the public access to rent cargo vans, box trucks, and pickup trucks via a mobile app and website. 2d. Am. Compl. [Dkt. No. 76] ¶ 16. Fluid offered a Fluid Vehicle Investor Platform ("FVIP") that enabled individuals and small business owners to purchase fleets of vehicles, and then rent them out via Fluid's platform. *Id*. ¶ 17. Plaintiff Urban Interests became an FVIP owner in 2020, and over time bought 47 vehicles and placed them into the Fluid fleet. *Id*. ¶¶ 19-20. Urban Interests entrusted Fluid both with its vehicles and the original paper copies of the vehicle titles. *Id*. ¶ 21. When FVIP owners like Urban Interests were ready to "decommission" their vehicles—remove them from the Fluid fleet—Fluid solicited those FVIP owners to allow Fluid to "sell [the] vehicle on [owners'] behalf" through a third-party auction service. *Id*. ¶¶ 1, 22-23. Fluid Truck opened two US Bank Accounts—the Fluid

1

Truck Disposition Account and the Fluid Truck Disposition Money Market Account (collectively the "Disposition Accounts")—that were designed to hold only FVIP vehicle owners' sales proceeds until they were transferred to the respective owners.  *Id.* ¶ 52

Unbeknownst to the FVIPs, Fluid's founders and co-defendants, James Eberhard, its previous CEO, and his sister, Jenifer Snyder, its previous general counsel, diverted sales and insurance proceeds from decommissioning through their own side company, Defendant HHK Vehicles, Inc ("HHK").  *Id*. ¶ 28.  Sometime in late 2023, Eberhard and Snyder, through Fluid and HHK, began withholding payments owed to FVIPs.  *Id*. ¶¶ 33-35, 61.  Instead of paying the FVIPs, Eberhard and Snyder were transferring FVIP funds to pay themselves and fund Fluid's other operations.  *Id.* ¶¶ 53-61.  Fluid has admitted to Urban Interests that it owes $178,216 to Urban Interests for net sales and claims proceeds in connection with the decommissioning of Urban Interests' Vehicles.  *Id*. ¶ 49. On a much wider scale, Fluid has admitted it wrongfully retained more than $11 million in sales and claims proceeds owed to hundreds of truck owners, who comprise the putative class in this case. *Id*. ¶ 50.

In July 2024, when the Fluid Board of Directors uncovered Eberhard and Snyder's theft of FVIP proceeds to fund Fluid operations, they were terminated.  *Id*. ¶ 65.  Mr. Avila and his company Paladin took control of Fluid immediately after Eberhard and Snyder's terminations.  *Id.* ¶ 66.  Paladin touts itself as skilled at guiding middle-market companies through challenging financial, operational, and strategic decisions.  *Id.* ¶ 10.  Mr. Avila is a partner and co-founder of Paladin.  *Id.*  Mr. Avila and Paladin were fully aware of the

2

circumstances of Eberhard and Snyder's termination and theft of FVIPs' money.  Mr. Avila and Paladin had a chance to end the theft, but instead only perpetuated it.  *Id.* ¶ 66.

When Mr. Avila and Paladin took over, Fluid still held $2.1 million in trust belonging to Plaintiff and other FVIP class members in the Disposition Accounts.  *Id.* ¶ 67.  Mr. Avila and his Paladin colleagues were all aware that the funds in the Disposition Accounts belonged to FVIP vehicle owners.  *Id.* ¶ 68.  To avoid any doubt, Mr. Avila was instructed by both a Fluid employee and a Paladin colleague that the FVIP vehicle sale funds could not be used for Fluid Truck operations.  *Id.* ¶ 70.  Despite this, and at Mr. Avila's direction, those funds were taken from the Disposition Accounts and used for Fluid's operating expenses, including paying millions of dollars to cover Paladin's own invoices as well as other expenses such as outside law firms.  *Id.* ¶¶ 71-76.

In addition, Mr. Avila and Paladin also learned that Fluid continued to receive insurance claim checks belonging to FVIPs that were being used to fund Fluid operations rather than being paid to the FVIPs.  *Id.* ¶ 78.  Mr. Avila even sent an email on August 21, 2024, stating that "moving forward, insurance claims payouts and monies owed for vehicle sales will be paid in a timely manner."  *Id.* ¶ 77.  Despite sending that email to FVIPs, Paladin and Mr. Avila continued to use insurance claim checks belonging to FVIPs to fund Fluid's operations and pay Paladin's invoices.  *Id.* ¶¶ 77-79.  In an October 1, 2024 email, Wyatt Branson of Paladin admitted that, under Paladin and Mr. Avila's direction, more than $300,000 in FVIP insurance claim funds received were not segregated into a separate account, and were instead used for operations instead of paying the FVIP owners what belonged to them.  And that was just for September 2024.

3

*Id.* ¶ 81. All the while, in the three months preceding Fluid's bankruptcy, Paladin collected more than $2 million in fees from Fluid. *Id.* ¶ 82.

Defendants' civil theft and conversion of the funds owed to Plaintiff and the class played out in two ways. First, Defendants took money belonging to the FVIPs from the Disposition Accounts without authorization and used it to pay for Fluid operations including Defendants' own invoices. Second, Defendants took possession of insurance claim checks belonging to FVIPs without authorization and similarly used them to pay for Fluid operations. Try as they might to shirk responsibility, or point the finger to other co-defendants, Plaintiff has easily stated plausible claims for relief against Paladin and Avila.

## ARGUMENT

### A.   Standard of Review

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed; however, a complaint may be dismissed because it asserts a legal theory not cognizable as a matter of law. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). A claim is not plausible on its face "if [the allegations] are so general that they encompass

4

a wide swath of conduct, much of it innocent," and the plaintiff has failed to "'nudge[] [the] claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting Twombly, 550 U.S. at 570). In assessing a claim's plausibility, legal conclusions contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotations and citation omitted).

### B. The Complaint States a Plausible Civil Theft Claim

"A person commits theft under section 18–4–401(1) when he or she 'knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception,' and acts intentionally or knowingly in ways that deprive the other person of the property permanently." *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 608 (Colo. 2016) (quoting C.R.S. § 18–4–401(1)(a)-(d)).[1] A civil theft claim requires that the defendant have the "'specific intent to permanently deprive the owner of the benefit of the property.'" *Id.* (quoting *Itin v. Ungar*, 17 P.3d 129, 134 (Colo. 2000)). "The intent to permanently to deprive the owner of the use or benefit of a thing of value may be inferred from the defendant's conduct and the circumstances of the case, but requires proof of a knowing use by the defendant inconsistent with the owner's

---

[1] The parties agree Colorado substantive law governs here. Dkt. No. 37 at 7; Dkt. No. 38 at 5.

5

permanent use and benefit." *People v. Sharp*, 104 P.3d 252, 256 (Colo. App. 2004) (defendant's knowing use of a cancelled credit card for hotel room stay met intent to permanently deprive).

Defendants make five arguments in support of their plausibility argument. Each fails.

First, Defendants claim that Plaintiff makes no allegation that Defendants "(knowingly or otherwise) obtained, retained, or exercised control over any proceeds (now or in the past) that were specifically owed to Plaintiff or a member of the class." Dkt. 89 at 10. This argument simply ignores the Complaint. Indeed, Plaintiff alleges:

- When Mr. Avila became Fluid Truck's interim CEO, the Fluid Truck Disposition Accounts collectively contained $2.1 million, which consisted of FVIP owners' sales proceeds. Dkt No. 76 ¶ 67.

- Mr. Avila and his Paladin colleagues were all aware that the funds in the Fluid Truck Disposition Accounts belonged to FVIP vehicle owners. *Id.* ¶ 68.

- Despite this, at Mr. Avila's direction, those funds were used for Fluid's operating expenses. Fluid Truck then drained monies from the Disposition Accounts and insurance claim proceeds, rather than remit those monies to the FVIP owners. *Id.* ¶ 71.

- By continuing the scheme to keep the FVIP owners' money and spend it on other purposes—including for its own fees—Paladin has approved of, sanctioned, and cooperated in the theft and conversion of Urban Interests' property and the property of other FVIP owners. *Id.* ¶ 90

Plaintiff and the putative class members are all FVIPs. *Id.* ¶ 93. Plaintiff clearly has pleaded that Defendants exercised control over funds belonging to FVIPs without authorization, and that Defendants improperly used those funds for Fluid's operations and to pay Paladin. Defendants similarly ignore Plaintiff's allegation and Paladin's admission that under Mr. Avila's direction, more than $300,000 in FVIP insurance claim funds

6

received were used for operations instead of paying the FVIP owners what belonged to them. *Id.* ¶ 81. In an effort to dodge blame, Defendants repeatedly highlight the theft that Eberhard and Snyder committed prior to their termination, and claim based upon the dollar amount transferred, Paladin's theft was not plausible. Dkt. No. 89 at 5. But this overly simplistic approach ignores the fact that all of Plaintiff's allegations against Paladin and Avila relate to actions taken **after** Eberhard and Snyder were terminated and Plaintiff alleges **more than** $11 million in damages.

Defendants next claim in a single sentence that Plaintiff fails to allege that Defendants acted with the intent to permanently deprive Plaintiff or class members of the vehicle sales proceeds. *Id.* at 10. This stance again ignores the express allegations in the Complaint: "Thomas Scott Avila and Paladin have knowingly retained funds belonging to Urban Interests and other Class members without authorization . . . with the intent to permanently deprive." Dkt No. 76 ¶ 127. In addition, the intent to permanently deprive can be inferred from the Defendants' conduct including use that is inconsistent with the owner's use and benefit. *See Sharp*, 104 P.3d at 256. Here, the fact that Paladin and Avila transferred funds that they knew belonged to FVIPs so that Fluid could pay Paladin's and Avila's invoices and fund operations is inconsistent with the FVIPs' use and benefit of their own money.

Second, Defendants argue that the Complaint does not allege Defendants have "possession of the [stolen] money." Dtk. 89 at 10. This argument fails on multiple levels. First, the civil theft statute itself permits a claim against the "taker" <u>or</u> "any person in . . . possession" of stolen property. C.R.S. § 18–4–405. What that means, of course, is if a

7

defendant may be liable as *either* a "taker" *or* "possessor" of stolen property, then that defendant need not retain or possess the money in perpetuity. Requiring that a civil-theft defendant must retain possession would inject an additional element into the civil theft statute, and that new element would erase the word "taker" from the statute. That is not sound statutory interpretation. *People v. Howell*, 550 P.3d 679, 683 (Colo. 2024) ("We cannot add words or subtract words from a statute….") (citation omitted). Second, such a purported requirement is belied by decades of Colorado caselaw, including *In re Estate of Chavez*, in which the defendant was held liable even after he returned the money to its owner. 520 P.3d 194, 204 (Colo. App. 2022) ("However, returning funds taken from Marie's account is not a defense to civil theft."); *see also Becker & Tenenbaum v. Eagle Restaurant Co.*, 946 P.2d 600, 602 (Colo. App. 1997) (affirming civil theft judgment where "[t]he funds represented by the check were disbursed to pay Eagle's other creditors during the period the check was wrongfully withheld, and plaintiffs were, thus, deprived of the use or benefit of the value of the check by the withholding"); *People v. Pedrie*, 727 P.2d 859, 863 (Colo. 1986) ("The fact that stolen property was eventually returned is not a defense to a theft charge.").

Arguing otherwise, Defendants point to *Goode v. Ramsaur,* 2024 WL 3849756 (D. Colo. Aug. 16, 2024). Dkt. No. 89 at 10. But *Goode* is a nonbinding unpublished decision addressing a motion for default judgment against a *pro se* defendant. And in so doing, *Goode* relied on *Cedar Lane Invs. v. Am. Roofing Supply of Colorado Springs, Inc.*, 919 P.2d 879, 882 (Colo. App. 1996), which has no application here. Unlike Paladin and Avila, the defendant in *Cedar Lane* was neither the taker nor the possessor of the stolen

8

property—nor a participant in the civil theft—but rather an innocent recipient who had already spent the money. 919 P.2d at 882. Moreover, *Cedar Lane* concerned only the "possessor" prong of the civil theft statute, and included no discussion whatsoever about the "taker" prong. *E.g.*, *id*. ("Section 18-4-405 permits the rightful owner of property to recover stolen property in the possession of another person and, in certain circumstances, to obtain treble damages."). Because there is no allegation that Paladin or Avila is the innocent recipient of stolen funds, those cases are unavailing. Finally, even if their interpretation of the law was correct (it is not), Defendants' contention fails because Plaintiff pleaded that Defendants paid themselves using the Disposition Accounts and would necessarily be in possession of the stolen funds. Dkt No. 76 ¶ 120–122. Accordingly, under any view, Plaintiff has stated a plausible claim for civil theft against Defendants.

Third, Defendants argue the $2.1 million in FVIP vehicle sale proceeds in the Disposition Accounts were allegedly commingled with non-FVIP funds and that this fact is purportedly fatal to a civil theft claim. Dkt. No. 89 at 10. Defendants continue to ignore the allegations in the Complaint. Plaintiff pleaded:

- Fluid Truck had two US Bank accounts—the Fluid Truck Disposition Account and the Fluid Truck Disposition Money Market Account—that were designed to hold **only** FVIP vehicle owners' sales proceeds until they were transferred to the respective owners. Dkt. No. 76, ¶ 52 (emphasis added).

- When Mr. Avila became Fluid Truck's interim CEO, the Fluid Truck Disposition Accounts collectively contained $2.1 million, **which consisted of FVIP owners' sales proceeds.** *Id.* ¶ 67 (emphasis added).

- Mr. Avila and his Paladin colleagues were all aware that the **funds in the Fluid Truck Disposition Accounts belonged to FVIP vehicle owners**. *Id.* ¶ 68 (emphasis added).

Notably absent from the Complaint is any allegation that the Disposition Accounts contained commingled FVIP and non-FVIP funds.

But even if the Complaint had alleged that the Disposition Accounts contained commingled funds, Defendants again misstate the law on civil theft. Defendants cite *Connolly v. Asbestos Abatement, Inc.* for its sweeping statement that "commingling of funds . . . is fatal to Plaintiff's claim." Dkt. No. 89 at 10-11. Defendants fail to explain that the *Connolly* court was discussing commingling funds in the context of restitution in a bankruptcy case, not establishing the plausibility of a civil theft claim. 606 B.R. 871, 886 (Bankr. D. Colo. 2019). Critically, as the *Connolly* court discussed, "the Restatement recognizes two broad categories of restitution remedies available to a victim: restitution in the form of money damages and restitution via rights in identifiable property." *Id.* at 885. Commingling is only relevant to return of property and "[i]f the property in question is untraceable, the claimant loses his equitable claim to the specific property **and must instead resort to a general claim for damages**." *Id.* at 886 (emphasis added). Plaintiff is not bringing an equitable claim for specific property but instead seeks damages. As such, even if the stolen funds were commingled with other funds, that is irrelevant to Plaintiff's claim for civil theft.

Fourth, Defendants recycle their second argument and contend that because Plaintiff has not asserted a claim for money had and received against Defendants, it is proof that "Paladin or Avila do not possess the proceeds at issue." Dkt. No. 89 at 11. The

10

decision not to plead one claim does not invalidate another. Plaintiff alleges that Defendants possess stolen funds when they paid themselves using FVIP sales proceeds. Dkt No. 76 ¶ 72. Regardless, as explained in depth previously, continued possession of stolen property is not dispositive when the claim is against the taker. *See supra* pp. 8-9.

Fifth, Defendants argue that the civil theft statute only allows claims to be brought against the taker or possessor of property, and not against someone who allegedly approved, sanctioned, or cooperated in the taking or possession of the property. Dkt. No. 89 at 12. But that once again ignores Plaintiff's well-pleaded allegations expressly asserting that Defendants themselves unlawfully took FVIPs' property. Dkt No. 76 ¶ 127 ("Thomas Scott Avila and Paladin have knowingly retained funds belonging to Urban Interests and other Class members without authorization, and have intentionally used and misappropriated Urban Interests and other Class members' funds to pay Fluid Truck's operating expenses, and to pay itself and third parties . . . ."). Indeed, C.R.S. § 18-4-401(1) provides that "[a] person commits theft when he or she knowingly obtains, **retains**, or exercises control over anything of value of another without authorization or by threat or deception." (emphasis added). Consequently, Plaintiff's allegations that Defendants knowingly retained funds without authorization are legally sufficient to maintain a stand-alone civil theft claim against Defendants as the "taker" of property.

But even if Plaintiff's claims against Defendants were solely based upon their "participation" in the theft, that would also be legally sufficient to state a plausible civil theft claim. Defendants do not cite a single applicable case to support their conclusion that the civil theft statute carves out claims against someone who participated in the civil theft.

11

Instead, Defendants cite *Estate of Brookoff v. Clark*, 429 P.3d 835 (Colo. 2018), which interpreted Colorado's "Dead Man's Statute." Dkt. No. 89 at 12. Of course, the Dead Man's Statute has no application in this case. Defendants' purported legal principle is in stark contrast to nearly 100 years of caselaw, in which Colorado courts have held that corporate officers can and will be held "personally liable to third persons for a tort [if] the officer of a corporation . . . participated in the tort." *Hoang v. Arbess*, 80 P.3d 863, 868 (Colo. App. 2003). Because civil theft is a tort, Defendants may be held personally liable for their participation in it.

The Complaint alleges Defendants' participation in the civil theft of the FVIP owners' funds. Upon Mr. Avila's arrival at Fluid, the Disposition Accounts contained $2.1 million. Dkt. No. 76 ¶ 67. Mr. Avila was aware that this money belonged to FVIPs and could not be used for operations. *Id.* ¶¶ 68, 70. Instead of paying the FVIPs their money, Mr. Avila cut off all payments to FVIPs and used that money for Fluid operations and to pay his firm. *Id.* ¶ 69, 72-73, 76. In addition, on August 21, 2024, Mr. Avila sent an email promising to pay insurance claim payouts owed to FVIPs moving forward. *Id.* ¶ 77. But when Mr. Avila sent this August 21 email, he knew that Fluid Truck was not segregating insurance proceeds, and was intentionally delaying such segregation of funds that belonged to FVIP owners, because of Fluid Truck's cash flow needs, including the need to pay his firm, Paladin. *Id.* ¶¶ 78-79. Under Mr. Avila's direction, more than $300,000 in insurance claim funds belonging to FVIPs were used for Fluid's operations after Mr. Avila's August 21 email. *Id.* ¶ 81

    **C.**    **Defendants Improperly Conflate Civil Theft Claims Involving Breach of Contract With Plaintiff's Claims**

Next, Defendants assert that the civil theft claim is defective because in any civil theft case, "there must be either a specifically identifiable account or a wrongful obtaining, retention, or exercise of control over specifically identifiable funds that belong to the plaintiff," and Plaintiff fails to make this allegation. Dkt. No. 89 at 12 (citing *Million v. Grasse*, 549 P.3d 1043 (Colo. App. 2024)). That is not the law.

*Million* involved claims that the defendant failed to distribute real estate sale proceeds as part of a settlement agreement. 549 P.3d at 1046. The plaintiff there brought claims for both breach of the settlement agreement and civil theft based upon the same facts. *Id.* The *Million* court expressly limited its holding to cases in which a plaintiff alleged **both** a breach of contract and civil theft claim. *Id.* at 1051. Indeed, the complete quotation from *Million* makes clear the court's own limiting principle:

> **To properly distinguish a contractual obligation to pay money that may give rise to a civil theft claim from a contractual obligation that does not support a civil theft claim**, we hold that there must be an additional inquiry. This is because money is fungible. If the property that is the subject of the civil theft claim is money, in order for the plaintiff to have a proprietary interest in the money, there must be either a specifically identifiable account or a wrongful obtaining, retention, or exercise of control over specifically identifiable funds that belong to the plaintiff.

*Id.* at 1051-52 (emphasis added). As further confirmation that this principle only applies to cases with the potential for both civil theft and contract claims, the *Million* court cites *Van Rees,* 373 P.3d 603, and *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186 (Colo. App. 2008).[2]. Both *Van Rees* and *Rhino Fund* concerned allegations of breach of

---

2   Moreover, the Colorado Supreme Court has never held that the "additional inquiry" identified by the *Million* court is appropriate in any civil theft case.

13

contract and civil theft related to that breach. *Van Rees*, 373 P.3d at 608; *Rhino Fund, LLLP,* 215 P.3d at 1190. Finally, in cases that did not involve both a breach of contract and civil theft claim, courts have not conducted this "additional inquiry" even when the theft involved money. *See e.g. Tisch v. Tisch*, 439 P.3d 89, 105 (Colo. App. 2019) (determining that majority shareholder engaged in civil theft when he used corporate profits for personal use rather than issuing distributions to shareholders). Plaintiff's claims against Defendants do not involve the intersection of a breach of contract and civil theft, and thus *Million* has no application here.

But even if this "additional inquiry" somehow applied here, Plaintiff's well-pleaded allegations easily meet this standard. The Complaint repeatedly points to a specifically identifiable account and specifically identifiable funds—the Disposition Accounts with FVIP funds and insurance claim proceeds, both of which Paladin spent on Fluid's operations, including paying Paladin itself. Dkt. No. 76 ¶¶ 52, 67-68, 77-78, 81.

### D. Plaintiff Alleges a Plausible Claim for Relief for Conversion

Defendants briefly argue that Plaintiff's claim for conversion against them fails because Plaintiff "makes no allegation that Avila or Paladin has or had dominion or ownership over any of Plaintiff's or the putative class's property," and "Plaintiff makes no allegation that it demanded the return of any property from Avila or Paladin. . ." Dkt. 89 at 14. Defendants' first point again just ignores the allegations in the Complaint, as Plaintiff repeatedly has alleged that Defendants (1) had dominion over the Disposition Accounts, (2) transferred of money out of the Disposition Accounts to pay themselves and others; (3) had dominion over insurance proceeds belonging to FVIPs; and (4) used

14

Case No. 1:24-cv-02811-GPG-NRN   Document 93   filed 05/30/25   USDC Colorado
pg 16 of 18

those proceeds to fund Fluid's operations including paying itself.  Dkt No. 76 ¶¶ 67-81.  In addition, as to the claims against Avila individually, corporate officers who collect funds owed to third parties, commingle them with company funds, and use those funds to pay employee wages are personally liable for conversion—even though "they received no personal benefit from the misapplication of the funds."  *Standley, v. Am. Auto. Ins. Co.*, 314 P.2d 696, 697-98 (Colo. 1957).

Next, a demand to return property "is not essential where conversion is otherwise shown or where demand would be unavailing."  *Schmidt v. Cowen Transfer & Storage Co.*, 463 P.2d 445, 447 (Colo. 1970); *Montgomery Ward & Co. v. Andrews*, 736 P.2d 40, 46 (Colo. App. 1987) ("Where there is a wrongful taking, the tort of conversion is complete upon that taking; the victim does not have to demand return of the goods nor does the wrongdoer have to refuse such a demand.").  Here, a demand to return Plaintiff's property is unnecessary because Mr. Avila announced his refusal to return FVIP owners' funds in his August 21, 2024 email, making any demand futile.  Dkt No. 76 ¶ 77.  Likewise, Wyatt Branson of Paladin admitted that, under Paladin and Mr. Avila's direction, more than $300,000 in FVIP insurance claim funds received were not segregated into a separate account and were instead used for operations instead of paying the FVIP owners what belonged to them.  *Id.* ¶ 81.  If the funds have already been spent, then the conversion has already occurred eliminating any demand requirement.

Plaintiff states a plausible claim for conversion against Defendants.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Dated this 30th day of May, 2025

>Respectfully submitted,
>
>*/s/ Christopher T. Carry*
>David C. Holman
>John K. Crisham
>Christopher T. Carry
>CRISHAM & HOLMAN LLC
>2549 West Main Street, Suite 202
>Littleton, Colorado 80120
>Telephone: (720) 739-2176
>E-mail: Dave@crishamholman.com
>E-mail: John@crishamholman.com
>E-mail: chris.carry@crishamholman.com
>
>*Attorneys for Plaintiff Urban Interests LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 30th day of May, 2025, a true and correct copy of the foregoing document was filed via this Court's CM/ECF filing system and served on all counsel of record.

/s/ *Amanda Turney*